We will hear argument in case 2827, United States v. Zubaydah. Mr. Fletcher. Thank you, Mr. Chief Justice, and may it please the Court. Our nation's covert intelligence partnerships depend on our partners' trust that we will keep those relationships confidential. Respondents seek discovery that would compel a breach of that trust by confirming or denying the existence of an alleged CIA facility in Poland. Respondents seek that discovery not to vindicate any rights under U.S. law, but instead in a discretionary Section 1782 application aimed at sending evidence abroad to a foreign investigation whose very purpose is to reveal and prosecute the alleged involvement of Polish officials in covert CIA activities. The CIA Director explained why that compelled disclosure would seriously harm the national security. The Ninth Circuit should have afforded deference to that expert judgment, and it failed to First, the Ninth Circuit undertook its own inquiry into whether the existence of the alleged facility was a secret, given public speculation on that subject. But under this Court's decision in Reynolds, the question is not whether a court thinks that the information sought is secret in some abstract sense, it is whether compelled disclosure will harm the national security. That is a question that squarely implicates the CIA Director's special knowledge and expertise. And here, the CIA Director explained that compelled disclosure would harm the national security because there is a critical difference between speculation, even widespread speculation, and formal confirmation by people with first-hand knowledge. Even the Ninth Circuit appeared to recognize the force at that point, and it did not suggest that respondents could have had the discovery they seek here from the CIA itself. Instead, and this was the Court's second error, it held that two former contractors can be compelled to confirm or deny the existence of the facility under oath because they are not agents of the United States. But again, the question is not the contractors' status under domestic law, it is how their compelled testimony would affect national security. And again, the Ninth Circuit should have deferred to the CIA Director's expert judgment that our allies and adversaries would view compelled testimony by these contractors as a serious breach of trust. I welcome the Court's questions. The two contractors have testified about the treatment of detainees before, right? That's correct, Justice Thomas. So why couldn't they also testify here? What difference would it make? It would make a difference because of the critical difference between the context of the testimony and what they would be conveying. In the prior contexts where they've testified, in the Saleem litigation and in the military commissions at Guantanamo, their testimony has focused on the nature of the treatment of detainees, on what was done. That is information that the Executive Branch, after extensive consultation internally and with Congress, decided to declassify in 2014 to facilitate public scrutiny of the United States' actions. So that information is no longer classified. But part and parcel of that declassification decision was a decision to keep secret, to keep the trust with our foreign partners. And because this proceeding is all about revealing the involvement of foreign partners, it's You say you offer the utmost deference standard. How would the government fail that? So candidly, we think that as this Court has recognized in Nixon and in other cases implicating the Executive Branch's judgments about national security, a court should be hesitant to second guess the Executive Branch on such predictive judgments. So are you saying it should never fail? No, certainly not, Justice Thomas. But I think the circumstances where it could should be relatively unusual, especially given the high requisites that the Executive Branch itself applies before asserting the state secret's privilege. I could imagine, you know, one example where a court found that the Executive's assertion insufficient was the D.C. Circuit's decision in Ellsberg, where the court explained that the Executive Branch's declarations just hadn't explained why one piece of information needed to be safeguarded. That seems like a circumstance where it's appropriate to say that the Executive hasn't made the requisite showing. But I think courts should be very reluctant to do what the Ninth Circuit did here, which is to essentially afford no judgment at all to the Executive Branch's predictive judgments on core matters of national security. Well, on this issue of the appropriate level of deference, I mean, the question is, or one question is, what is the deference to? Surely when the CIA director says, here are threats to national security interests, here's the harm to national security that we think will follow from something, that judgment is entitled to a great deal of deference. Courts are going to know less about that than the CIA director does. But as I understand the inquiry in Reynolds, the way this process works is that that judgment is weighed against something else, which is the question of the necessity that the requester has. And then in addition, there's the question of segregation. And as to those matters, I would think that there's really no deference given to the CIA director at all. In other words, as to what level of necessity is at issue and how those two things are weighed and how the segregation analysis works, aren't those judgments for courts? I think I agree with you on those two points, but I just want to make sure that we're in agreement that the Ninth Circuit and respondents are advocating for a lack of deference on other questions. On this threshold, is it a secret question? And on this notion of, are these contractors the sorts of people who could give the kind of formal confirmation that would be damaging? But on the question, if we're past that, and the question is, what's the level of necessity? I agree with you. I do think, though, that in Reynolds, the court suggested that necessity goes not so much to do we give deference ultimately to the executive branch's judgments about national security. It's how far should the court probe? I think in Reynolds, the court was focused specifically on, should we require in-camera examination of the materials or some examination of classified materials? And if there's a great showing of necessity, then maybe that's appropriate. And otherwise, maybe it's not. But the sort of predicted national security judgments, I think, deserve deference no matter how great the showing of necessity is. Mr. Fletcher, I'm a bit confused in this case, because it seems to me that you came in to say no discovery whatsoever is appropriate. Yet, in your introduction, you said that the terms of conditions of interrogative techniques is no longer secret. So it does seem to me that at least that could be separated out in any discovery. And there might be other things. I don't think we need to parse all of it in this case. But is it your position? I'm not quite sure what you're asking us to say. Are you asking us to say the governments do a great deal of deference on whether a security threat would exist as a result of a disclosure? Yes. Or are you asking us to say a security threat will exist and we have to give deference to your judgment as opposed to the district court's judgment as to what will protect that or not? Because at the end, the district court has a lot of power under Reynolds to fashion remedies that will protect that interest. You might disagree as to a remedy, but that's different from lack of deference. That's an abuse of discretion standard by the district court. So let me start with the district court because I think actually the deference that should be afforded to district courts helps us here because respondents made the same pitch that they make in Part A of their brief and that you alluded to in the beginning of your question, this possibility that why can't Mitchell and Jessen testify about what was done but just not use the word Poland, somehow divorce it from express geographic references. They made that request in the district court too. And the district court rejected it. This is at page 56A of the petition appendix and explained that because this entire proceeding is predicated on assisting an investigation in Poland by a Polish prosecutor, it would be disingenuous to try to pretend that it's not all about Poland by using code words. So I think actually on the question of the district court's management of the trial and on what methods of safeguards could be used to protect national security information, the judgment made by the district court here actually helps us in further regards. I see the Ninth Circuit's majority opinion as basically not understanding why the district court felt that taking why the information couldn't be separated out and all it was doing was sending it back for the district court to explain it in more detail. I didn't read what you said in the district court's opinion. You may or may not be right, but I thought the Ninth Circuit was just unsure. So why shouldn't we send it back for the clarity of that ruling? So as to what the district court said, and this goes to the respondent's proposal about let the testimony proceed but use code words, the district court rejected that very clearly at page 56A, and the Ninth Circuit didn't really adopt it either because what I understand respondents to be advocating now is we don't need to mention Poland at all expressly. The government's concerned about confirming or denying a facility in Poland, so just let us have the discovery without using that word. I have a different question. You led your brief with the state secrets argument, but you do an alternative, as you did in your cert petition, that this was an abuse of discretion under 1782. Correct. Based almost on the same theory that it would be against U.S. interests. Once you said that there was a state secret, but I think it's also because you had already denied the MLAT, and that argument has some attractive force for me. It seems there was already a mechanism for the Polish government to seek discovery. They invoked it. The government said no on state secret grounds. Can you imagine a situation in which that denial shouldn't be enough for purposes of defeating a 1782? It's very hard for me to imagine one, Justice Sotomayor, and respondents certainly haven't pointed to one. I agree with your characterization of the relationship between the two issues, that they are very closely related, that in some ways the 1782 issue is almost a fortiori from the state secrets purpose. Your use of code words, I think, doesn't quite answer the question. That suggests that they really are going to be talking about Poland. They're just not going to say Poland. But it seems to me there may be a lot that they can talk about that have nothing to do with the actual location at which events occurred. Why shouldn't the district court go through the testimony and say anything that looks like location you can't get into, but what did you do with the petitioner? What was your relationship with other people? Nothing about Poland. Why can't that be a way to proceed? So, Mr. Chief Justice, that works in contexts like Saleem and in contexts like the military commissions where there was no focus, no relevance to the location at all. And so it can be completely excluded. What the district court found here is that you can't take the location out of this proceeding because the whole point of the proceeding is to get evidence for a Polish investigation. The evidence wouldn't be relevant unless it had occurred in Poland. So the very first sentence of the Section 1782 application, page 110A of the petition appendix says, we are seeking evidence to send to a prosecutor in Poland. Twelve of the thirteen written discovery requests specifically refer to Poland. So, Mr. Fletcher, does that mean that if this were a United States court, it would be different and you wouldn't be asserting privilege over this material, as you didn't in Saleem? I mean, you know, the evidence of how he was treated and his torture. If it was a tort suit in the United States court or a military commission in the United States court where the location was irrelevant, then I doubt that we would be asserting privilege just as we didn't in Saleem. Well, doesn't that mean that it's not that the information that they say they want is itself privileged? It's something about the context that later creates a privilege, which seems odd, right? Well, I guess I'd resist that a little bit because I think you have to look at all of the circumstances of the disclosure. And here, my assumption in answering your question about in a different suit would be you could completely divorce any geographic references from the testimony, as was done in Saleem, as was done in the military commissions. Here, our basic submission, and the district court agreed with this, is that it's just not possible to do that because of the nature of the proceeding. But even if you were hesitant about that, I think there are a couple of other reasons to be resistant to this code words approach that respondents have advanced now. One of them is a concern that even the Ninth Circuit majority acknowledged and that Judge Gould highlighted in his dissent from the panel, which is that the purpose of this inquiry is to take evidence and ship it abroad to be used in a probe of alleged involvement by Polish officials in the CIA's covert activities. And even if that information appears benign in and of itself, the whole point of the inquiry is to match it up with other information to shed further light on activities and identities that everyone agrees are privileged. And I think that in and of itself is a serious concern to sort of indirectly accomplish what even the Ninth Circuit and respondents aren't contesting you couldn't do directly. That's mosaic? The mosaic theory, exactly. And I think that the second thing, the sort of third response with the first one being the whole thing is about Poland, you can't extricate that. The second problem being the mosaic problem. I think the third problem would be that this line of argument tries to leverage the government's past disclosures, first in the Senate report and then of similar information about the United States' own actions in cases like Salim, and use that to pry open the door and force the executive branch to go further than it's gone already. And I think that's a dangerous thing to do. The executive branch in consultation with Congress went to great lengths to declassify information to facilitate scrutiny of our own actions, but drew a line that has now been adhered to across three different administrations, scrupulously protecting the identities of our foreign partners. And I think to say that because some of that information about our own conduct has been revealed and we have been accepting of scrutiny of our own actions, that should allow respondents and others to leverage further disclosures that would implicate the concerns of our foreign partners. I think that's just a dangerous thing to do. What if the foreign partners have no objection or in fact have confirmed the relationship themselves? So I think that would change the inquiry. I'm sure that something like that is a factor that the CIA director or the other official would have to take into account in making the national security judgment in the first instance. I don't think it would completely eliminate the concern. The CIA director here explained that the agency's relationships with its foreign intelligence partners are really generational relationships with those foreign intelligence agencies, and that the sort of trust that those relationships rely on depends not just on what's happening now today, but also on the assurance that we'll preserve confidentiality even if other parts of the foreign government later take a different view. So you would go so far as to say that even if the Polish government filed an amicus brief in this court saying okay with us, that still you would be up here making this argument? Well, I think I would be making this argument only if the CIA director had concluded under the circumstances of which this would be one that there would be serious harm to national security if the disclosure went forward. And what I'm doing in candor is telling you that some of the concerns that Director Pompeo has identified here might continue to apply in a scenario like that. But the judgment would have to be made under all of the circumstances, and certainly that one would be irrelevant. Didn't the president of Poland say something like that? So the former respondents point to two press interviews by the former president of Poland that in sort of ambiguous terms acknowledge cooperation with the CIA. So we don't deny those. But those statements contradict that former president's prior statements. And as the European Court of Human Rights decision that the parties cite explains, the government of Poland itself has denied participation in the program. It refused to cooperate in the ECHR litigation. And I'm not aware of any change in Poland's official position on that question. But to go back to basics, forget the facts of this case. And I'm not saying that what I'm about to say has anything to do with it. What's supposed to happen in the law if a person in a domestic intelligence agency acts in a way that is absolutely beyond the pale against American law, against international law, against anything in the world? All right. So then they come in and say, no, we're not going to have someone hurt by that brings a case. We don't want to give it to you. It'll hurt the United States. Well, it will. All right. So does the court have no way of getting such information? Well, I think that to begin with, I think the executive branch would take that very seriously. If we assume, let me assume for purposes purely of my hypothetical. But for purposes of my hypothetical, assume that the executive branch doesn't want this to get out. Is that just a terrible thing? Et cetera. Yes. So I'm really interested in the power of the court. So I think ultimately that would be a situation where the colloquy that I had with Justice Kagan would be relevant, where you had a party who was seeking the evidence to assert rights under domestic law in U.S. court, unlike this case, which is quite different. There'd be a pretty strong showing of necessity. And so I think that would authorize the court to probe and say, I want to know more to understand the basis for this assertion. Ultimately, of course, our view would still be that the executive's national security judgment is entitled to deference. And if under that deferential standard, the court agrees that the disclosure would harm national security, then that evidence could not be disclosed. And I understand that that's a harsh consequence. That was the consequence in Reynolds itself, which was a tort suit against the United States for alleged malfeasance by the United States. So I don't deny that that's a harshness of the doctrine, but I think that's also inherent in the state secrets doctrine. Suppose, Mr. Fletcher, there was overwhelming, essentially incontrovertible evidence that the acts here did take place in Poland. Suppose somebody had leaked videos that everybody agreed were authentic. What then? So again, I think the answer would be those would be additional circumstances that the first instance would want to take into account and would have to explain in the declaration explaining why further disclosure could still harm national security. Again, I think even in that circumstance, there would be concerns. The CIA director here talks about there being a difference between even what appears to be definitive proof and actual formal confirmation by people with firsthand knowledge on the subject, that our allies and adversaries view those as two different things. I understand the argument about our relationships with our allies and it not necessarily being so extensive with the question whether something is a secret. But at a certain point, it becomes a little bit farcical, this idea of the assertion of a privilege, doesn't it? I mean, if everybody knows what you're asserting privilege on, what exactly is this privilege? I mean, maybe we should rename it or something. It's not a state secrets privilege anymore. Well, I guess I'd resist the idea certainly that it's anywhere near the farcical zone here. I mean, this is a line, as I said, that the executive branch drew back in 2014 that it's adhered to ever since. The foreign countries that were involved in this program, none of them have come forward. All of them have viewed it as important to preserve the confidentiality of this information, notwithstanding all of the speculation that's out there and that's in the amicus briefs recited here, much of which existed in 2014 too. So I guess what I'd say here is that I understand that the hypotheticals get difficult and you know, greater and greater certitudes of public knowledge. But in this case, I think the sort of facts in the world and the evident importance that the political branches in the United States and our partners abroad have put on preserving this confidentiality confirms that there is something to it here, that there is a difference between what's out there in public now and confirmation or denial in an official sense. What is the current status of the proceeding in Poland? I'm not sure exactly of the status. I know respondents note in a footnote that one part of the investigation has been closed. What's in the record that I'm aware of are some reports that Poland has provided to the ECHR about the status of its investigation that basically say the investigation is ongoing. They note that they've sought information from the United States, but as Justice Sotomayor and I discussed, the United States has refused to provide it under the MLAT because of national security concerns. But beyond that, I don't know the details of where things stand. Who in the Polish government can make a request under the MLAT? The requests come through a central authority. Each treaty partner has identified a central authority to pass along requests under the MLAT. The requests here originated with the regional prosecutor and then were passed along by that central authority. So the regional prosecutor here, I assume, maybe this is incorrect, is a typical civil law system investigative magistrate who is operating independently. It's not like someone in the Department of Justice in the United States who's ultimately answerable to the Attorney General. It is not the government of Poland in the same respect that a federal prosecutor in the United States would be exercising the authority of the government of the United States. I don't want to make representations about exactly how the Polish system works, but I think I can give you some detail that confirms the thrust of your question, which is that even after the regional prosecutor began sending the first of the MLATs, which began back in 2009, the government of Poland declined to release the former Polish president from his obligation of secrecy, refused to confirm or deny the allegations in the ECHR proceeding, didn't cooperate with that investigation. And so I think what that tells you is that whatever the inner workings of the Polish system, the official position of Poland is not necessarily reflected in the MLAT requests or in the investigation. Mr. Fletcher? Yes, Justice Kavanaugh. To what extent is the privilege a constitutional privilege, and to what extent do you think the privilege is a common law privilege that could be altered by Congress? I think this court hasn't had to answer that question. Reynolds, which was the first recognition of the privilege, said that it was firmly rooted in the law of evidence, the common law of evidence, and it was. In subsequent cases like Nixon and Egan, the court has also made clear that it has constitutional roots in the executive's Article II authorities to protect the nation and safeguard confidential information. So I think it's both. And as to the question of what could Congress do to change the privilege, I certainly think Congress might be able to set forth mechanisms for asserting the privilege. If Congress were to try to cut back on the core of the privilege recognized in Reynolds, then I think that would present the constitutional question suggested in Egan and in Nixon, but that this court has never actually had to resolve. Mr. Fletcher, in Saleem, the government was present in the suit trying to police the boundaries of the contractor's testimony and to ensure that things like location were not revealed. Would that be possible in this proceeding? Would the government be able to participate? Let's say that we disagree with you and we say it's not privileged, at least insofar as we're talking about the treatment, at least insofar as we're talking about potential torture, et cetera. Does the government have the right to participate and ensure that those same safeguards are present? So we do have the right to participate. We've intervened in the litigation. I think all parties have assumed that that would give us the right to be present and to levy objections during discovery. I do want to hesitate, though, to the extent your question suggests that that sort of participation would be sufficient in a proceeding like this one. I think it would run up against all of the concerns we talked about earlier with using code words and also just sort of inherently would raise the concern that this court alluded to in general dynamics about the risks of inadvertent disclosure or about piecing together the puzzle that are especially acute when you have parties who have every incentive to probe right up to the line of privilege, which respondents do here. And so I think, to our view, that's reason enough to conclude that the state secret's privilege precludes further discovery here. But at a minimum, even if you don't get there, I think it's highly relevant to the consideration that Justice Sotomayor discussed under 1782, which is both this request circumvents the in-line mechanism and the express exception in the negotiated treaty and also that it would be incredibly intrusive and burdensome to have discovery proceed in that fashion. Thank you, counsel. Justice Thomas, anything further? Please. Mr. Fletcher, should we be thinking about this as a Reynolds case or an Intel case? In my mind, your claim of state secrets really undermines the foundation of Reynolds. And so I'm hesitant to call it a Reynolds case. I think it's an Intel case. We're content to have you think of it as either. In our view, it's both, and they dovetail, as you and I discussed. But if you are not willing to decide the privilege question all the way or to take it as far as we would take it, then I think a perfectly appropriate disposition would be to say that, at a minimum, the circumvention of the MLAT process and the intrusion and burdensome nature of the discovery that would have to happen and that would still carry risks of disclosing secret information. Oh, well, even in Intel, it's also the necessity, which is a question that I'm going to ask your adversary. You're right, exactly. We're not talking about vindicating any U.S. rights. We're talking about just seeking evidence for a foreign proceeding, which is, we think, categorically a lesser showing of necessity. Thank you. Justice Kagan? Just again, Mr. Fletcher, on this idea of using code words, I mean, given that Petitioner was detained in two separate locations, you know, isn't there a way of enabling this information to go forward without saying which of the two locations, you know, this treatment happened? So you're saying, well, everybody would know it's Poland if there were such information about treatment, but maybe not. You know, code words, and it could be Poland or it could be another location. Well, Justice Kagan, I think my friend on the other side would have to speak to what it is that they have in mind with this code words proposal, but quite a lot of information about Abu Zubaydah's treatment is already in the SISI report and has been made public. What I understand them to be seeking is tell us what happened at detention site blue or tell us what happened between this date and this date, where we believe he was in Poland. That's what raises the concern for us, you know, the whole thing is premised on this notion that this is a proceeding to get evidence for use in a Polish prosecution. The evidence wouldn't even be appropriate for disclosure unless it were relevant to that Polish prosecution. I think at that point... I guess what I'm suggesting is suppose the Petitioner just said, tell us what happened wherever, and didn't ask you to say anything about the location, whether it was the blue location or the green location. And then the Petitioner had to come up with evidence on his own to satisfy the Polish authorities that it was one rather than the other. But that nothing in his request to you and nothing in the government's response to that request suggested whether it was the blue location or the green location in which the relevant acts took place. So I guess, again, not for me to say, it's not clear how much good that would actually do them, but if you actually took both the code names and the dates out of it and just said what was done, I think that mitigates the concern that I had about the mosaic theory to some extent and piecing together information in ways that would be damaging. I still don't think it avoids the fundamental problem that the District Court identified that at this late date, when this whole proceeding has been about Poland from day one, from line one of the application, you can't take that out of the case by just not saying it out loud. So we still have concerns that this looks like a breach of trust if it goes forward at all. But I certainly acknowledge that that does mitigate some of the concerns. Justice Gorsuch? Mr. Fletcher, do we start on an agreed premise that the government bears the burden of proving the privilege up? Under the standards set forth in Reynolds, yes. And any privilege can be waived, and the determination of the privilege's waiver, the scope of it, is a matter for the court? It's a matter for the court, but I think the court in Reynolds is very clear that this is a privilege that can only be waived by the government, not by others. Sure, but then you don't waive it as to what you pick and choose to waive. You waive it as to a subject matter. That's how waiver usually works, and it's determined by the court, not by the happenstance of the disclosing party's choices. I know that some privileges work that way, and in some contexts courts have concerns about gamesmanship with selective assertions of privilege. I don't think that's how concerns about national security have worked. What's your authority for that? I think a line of cases from the lower courts addressing similar questions under FOIA where there can be questions about Where they've expressly rejected the idea that waiver extends to a subject matter and not to particular matters that the government has chosen? There's a doctrine known as official acknowledgment, and the idea is that FOIA Exemption 1, which protects classified information, doesn't apply only if the government has officially acknowledged exactly the information that is being sought and is not waived by related disclosures by the government or by public speculation or by things of that nature. We cite those cases at pages 30 to 34 of our brief. Thank you. And when the district court is considering the degree of deference due an assertion of secrecy, is it entitled to take into consideration the increased number of classification, the increased classification of documents these days? I guess I'm not sure that that would be directly relevant. I think each assertion ought to stand on its own bottom, and if it's a valid assertion and the standard is met, then that would be appropriate. How about the increased assertion of the state's secrets of privilege? Is that something the district court can take into account? Again, I'm not sure how that would be relevant to the inquiry. I think the question for the court is always, is this disclosure a threat to national security, and has the executive branch established that under the standard in Reynolds? Irrelevant, in your mind? I think so, Your Honor. How about the fact that the allegations are old, factually dated? Is that something the court can take into account? That's a circumstance, I think, that may be relevant to whether disclosure would affect national security, and so, like a number of the other circumstances we've talked about, would be something that the court can take into account. Through the lens of deference. Of course. And same thing with the extent of public knowledge. I assume you'd agree that that one is also something the district court can take account of. Again, through the lens of deference. And then how about the nature of the allegation and the seriousness of it? An allegation of torture. Is that something that the district court, and Justice Barnes touching on this, is that something the district court can take cognizance of? I'm not aware of authority that speaks to that one way or the other. The way I could imagine it being relevant is potentially in the necessity inquiry, but I think the way that that would be relevant is not just about the seriousness of the conduct at issue, but what is the need that the party seeking the information has for it. And so if you had a party that was asserting rights in U.S. courts, substantive legal rights in U.S. courts, the gravity of those rights might weigh into the necessity inquiry. Here, though, I understand the seriousness of the allegations about treatment, but I think the necessity inquiry and the necessity analysis looks very different because it's ultimately evidence for a foreign proceeding, not rights under U.S. law. Thank you. Anything further, Justice Kavanaugh? No further questions. Justice Barrett? Thank you, counsel. Mr. Klein? Mr. Chief Justice, and may it please the Court, let me start by making one thing clear. I'm not planning to ask did it happen in Poland. The Polish prosecutor already has information about that and doesn't need U.S. discovery on the topic. What he does need to know is what happened inside Abu Zubaydah's cell between December 2002 and September 2003. So I want to ask simple questions like how was Abu Zubaydah fed? What was his medical condition? What was his cell like? And, yes, was he tortured? These topics are declassified. The government has allowed Mitchell and Jessen to testify about them publicly twice before, in the Saleem case and before military commissions. They testified about Abu Zubaydah's treatment in general and at particular sites outside Poland. They testified about another detainee's treatment at the Polish site identified by codename. The government itself placed their testimony online. The government's briefs make no pretense that these topics are privileged. The remand directs the district court only to consider whether classified and declassified information can be separated. It does not require discovery. It leaves that to the district court. If the district court does allow discovery, then it can use the same tools it used in Saleem to protect state secrets. And, yes, Justice Barrett, I do believe that the government would be in attendance just as it was in the Saleem case and would be able to object. It could enter an order limiting deposition topics. It could have depositions proceed under seal. And it can postpone answers to any questions that draw objection until the court has ruled on them. Poland would receive only a record approved by the court after appropriate objections and perhaps even another appeal. This is what courts do, and it's what they do well. It's the very judicial function this court in Reynolds charged lower courts to carry out. Now I welcome the court's questions. Mr. Klein, you said that much of this has already been disclosed. If it has been, why do you need additional testimony? Well, frankly, what has been disclosed is not limited to a date range. So we know it's well publicized that obviously Beda was tortured. In fact, this is referenced in Mr. Mitchell's book and described in excruciating detail. But he doesn't say that it was at a particular place or in a particular – at times he says in a particular time, but he doesn't speak to our time frame. So the Polish prosecutor has the information, as we understand it, has the information about when and where. He has made representations to the European Court of Human Rights. They were a willing participant, by the way, in the European Court of Human Rights. They represented that they had interviewed 62 people to learn what they could about the site in Poland, and they represented that they had amassed 43 volumes of documents about it. And they appeared and made those representations that they had conducted what they thought was an appropriate investigation. So how do you square that with how you started your argument that you're not – you seem to suggest that you were not interested in the location, but it seems as though you're looking for more information to tie it to Poland? Well, I would say that we're not – we no longer need information to tie it to Poland. We know where Obyzbeta was. We want to establish how he was treated there. That is what we're looking for. At that specific location? Well, yes. The context is a particular location that has been established by the Polish investigation, as we understand it. One last question. How does helping a prosecutor in Poland amount to the necessity that you would need under Ramos? Well, under Polish law, Obyzbeta has particular rights to, frankly, to stand as an accuser of those who have assaulted him. That's a feature of Polish law. Not only can he be a complainant, but he can submit evidence to the prosecutor, and if the prosecutor declines to go forward with the prosecution, he has a right of appeal in Poland as well. He can appeal to a court. So as a practical matter, in the way we conceive of it, he's more like a party. Not that that would matter under 1782, because all it requires is that he be an interested person and not necessarily a litigant, as this court held in Intel. Counsel, I guess what I can't get past is similar to Justice Thomas' question. You say that it's not a secret that there was a black site in Poland. So you say it can't be a state secret if it's not a secret, because that's well established. And then it's not a secret that he was tortured either. So it seems to me that if that's all you wanted to prove, by your own characterization of those facts, you don't really need them. And then in your answer to Justice Thomas, you suggested that, no, what we really do need is the testimony of the contractors to show that it happened in Poland. But you've also conceded, I thought, that that testimony would be privileged. Am I understanding you that that would be privileged? No, not really. I guess the way I would describe it, Justice Barrett, is we do need the testimony. The existence of the black site has been established as a legal matter in the European courts. We believe that it's not a secret. That's a disputed question. So you don't need them for that? We don't need it if we adopt the protocol that was used in Salim and simply don't refer to the site by name. And for that matter, it doesn't even have to be referred to by alter ego, like detention site blue, even though that's plastered across the record. But if you don't need them to establish the existence of the site in Poland and you don't need them to establish what happened to him, the torture that he underwent, what do you need them for? To show that it happened in Poland, right? To show that it happened when he was in Poland. And do you accept, I kind of read your brief, to accept that that particular piece of it would be privileged? Am I misunderstanding that? No, we don't accept that. The Ninth Circuit concluded and the District Court concluded, and we agree, that the fact that the site in Poland is a public fact, it's not a secret. But the fact that he was tortured by these contractors in Poland, that's not a state secret? We're not necessarily, well, I would say that that is not a state secret as well. That's correct. Because the very fact of torture, the so-called enhanced interrogation techniques are not a secret. They are declassified by the government. The fact that the site is in Poland and that he was taken there was found by a court of law and also acknowledged by Poland's president, who said that he approved it. So, no, we don't think that those facts are state secrets. The government's argument is that the confluence of those facts is somehow a state secret. And the government's argument, and what it really hinges on is this idea that I can ask the same question, well, let me put it this way. Suppose Salim's lawyer asked, what happened to Abu Zubaydah on January 1, 2003? That's not privileged. That's not a privileged question because he's asking it in the context of a different proceeding. And questions like that were asked, by the way. But if I ask the same question for use by a Polish prosecutor, asking again, forget about Poland for a minute, what happened to Abu Zubaydah on January 1, 2003, the government says that that is privileged in that context and that context only. So could you ask him, did you torture Abu Zubaydah in Poland on this date? Could you ask that question under your view of the privilege? Well, under the Ninth Circuit... Under your view. We share the Ninth Circuit's view on this. The answer is yes, because the fact of Poland itself is not secret. But from the very beginning, from the moment the government filed its motion to quash, we offered to amend under Rule 45 to allow the proceedings to go forward without mentioning Poland. But it seems to me that since all that is public, and I'll end after this, it seems to me the only thing you gain is an acknowledgement by people who work for the government that it happened. That's the piece that you're missing. You kind of want the United States' official involvement to be part of the record, and you say that's not a state secret. We're not looking for the United States' official acknowledgement. But what we do gain is placing some of the torture in a particular time frame, which the Polish prosecutor has associated with Abu Zubaydah's presence in Poland. I guess I'm having trouble following exactly what it is you're looking for, and I don't think you're grappling with the point that Justice Barrett just raised, which is everybody may know about this. You know, as you put it, it's no secret at all. But you don't have the United States government acknowledging that. And the United States government says this is critically important because our friends, allies, intelligence sources around the world have to believe that we keep our word, and our word was this is secret. And so they may be, you know, the CIA director may be the last person in the world to have said this is where the site is, but that's what's important, what the United States has revealed, not what you find. You say you're not going to ask anything about Poland. Well, then, why do you need the director of the CIA in the United States government to agree with what you say you've got enough proof on, that there was this site in Poland? Mr. Chief Justice, we don't need the director of the CIA to agree with us, and, in fact, we don't need any CIA employee to agree with us. But the director, I met the... You need the director not to acknowledge or to withdraw the, you know, assertion under... You need somebody from the United States government to acknowledge the existence of this site, right? We need a court, this court, to acknowledge a rule of law and determine whether the CIA director's statement in paragraph 17 of his declaration, which is at the center of this, is well taken. And this is at the core of what the Ninth Circuit did in addressing what I call the attribution question. The CIA director said, we can't have it attributed officially to the CIA that these things happened in Poland, whether it's true or false. We can't acknowledge or deny it. And that was the important thing, all right? And in that paragraph, I think 134A and 135A, in that one paragraph, he uses the phrase official acknowledgment or official confirmation and it's converse eight times. And he says what's really crucial is not that the CIA exposes a secret, but officially acknowledges this non-secret because he was responding to the fact that Poland's president had already acknowledged it. And he said, but we're not. That's important because what he's saying, what he's saying, Severoza, is this is not a secret, but it's important that the CIA not be heard officially to acknowledge it. So is that what you want? You want them officially to acknowledge it? No. You don't want that? No, we don't need that. All you want is to know what happened. Well, we want the testimony. We want, exactly. If it's exactly, why don't you ask Mr. Zubeda? Why doesn't he testify? Why doesn't Mr. Zubeda? He was there. Why doesn't he say this is what happened? And they won't deny it. I mean, I don't think if he's telling the truth. You're talking about Mitchell or Gasson. No, I'm not. I'm saying the person who was there was, I don't know if he's your client. Isn't he your client? His name is on the sign. Mr. Zubeda cannot testify. Why not? Because he's being held incommunicado. He has been held in Guantanamo. Why? Why? I mean, I'm not sure this is relevant, but I mean, in Hamdi, we said you could hold people in Guantanamo. The words were active combat operations against Taliban fighters apparently are going on in Afghanistan. Well, they're not anymore. So why is he there? That's a question to put to the government. We don't know the answer. I mean, have you filed a habeas or something to get him out? There's been a habeas proceeding pending in D.C. for the last 14 years. There's been no action. They don't decide? I'm sorry? I mean, you just let it sit there. I guess this is not relevant, but I'm just curious. Personally, I'm not handling that proceeding. But, no, my understanding is that we've done everything we could to move it forward, but it simply has not moved forward. Mr. Klein, I think I understand. Because you're held in Guantanamo, you're not permitted to sign affidavits or give any testimony, correct? That is correct. And so what you're saying to me is that you believe what's missing from the Polish investigation is someone who actually says, on this date, regardless of where it is, Mr. Zubaya was tortured. That's right. And that goes to the government's mosaic theory, which is, and this is what you're disavowing. Because it's not a state secret that he was tortured, the date he was tortured is not a state secret. The place may be, but he doesn't have to say the place. You will let the Polish authorities prove that some other way, correct? If that's the way we're directed, if we're not allowed to utter the word Poland in asking deposition questions, absolutely. This goes directly to the government's point, which is the state secret, they're going further than the state secret, because the torture is not a secret. That's been testified to in a variety of different places. What they're saying is our state secret is we don't want the U.S. courts to assist Poland in investigating what may or may not happen there, even if the evidence here doesn't name Poland. Do I got this right? I think you do, Justice Sotomayor. I apologize for interrupting a moment ago. I think that goes to the heart of it. We're not talking about a secret anymore. We're talking about a governmental wish not to assist this Polish investigation. So that goes back to the MLAT, which is this is a government agreement with Poland about what happens when a state secret is invoked. And both governments have agreed that when each side invokes a state secret, the other can say, they can say no. Aren't we ignoring that agreement between governments? You represent the Polish government in this action. You're acting to help them. So why don't we view that or view this request as a request by the Polish government? Well, I'm representing Alicja Beda in this action. No, no, I understand. No, but you're doing it to assist the Polish investigation. Well, I would say the Polish investigation is looking after Alicja Beda's interests, not the other way around. Alicja Beda has... But it doesn't act on behalf of him. It acts on behalf of the state of the nation, Poland. I would agree with that. But the Polish government did not direct Alicja Beda to pursue this claim. That was initiated by his counsel in Europe, filing a complaint. It's obviously Beda's interest we represent. He is a private individual. He is certainly not the Polish government. He was not given direction by the Polish government. When the MLATs were denied for the seventh time, yes, the prosecutor did say, as I understand it, not having been there myself, said to the Polish lawyer for Abu Zubaydah, I don't have anything. You have rights under the law. Why don't you submit something? And so that was a self-initiated act. That was not an instance of the Polish prosecutor saying, go file a 1782 request and see what comes of it. That's not why we were there. Mr. Klein, I may just not be understanding this, but when you say it's not a secret, I mean, there are several things that aren't secrets. There's plenty of evidence that the petitioner was tortured in some location. But is there, in fact, evidence that he was tortured in the dates that you are trying to establish that he was tortured in? In other words, I thought that the Senate report actually talks a good deal about the petitioners, the torture that the petitioner was subject to, but in an earlier date. And what you need to continue on with this investigation is essentially some evidence that that treatment was continued at a later date, the date in which you say he was in Poland. And that is not in the public record. Am I right about that? You're basically right about that, yes. There are hints of it. And what I would point to in particular in the Guantanamo proceedings before the military commissions, when Mitchell testified, he said, and this is a thin read, I will acknowledge, but he said that Abu Zubaydah was treated very shabbily when he was held in Poland. And there was no lawyer there to represent Abu Zubaydah's interests at the time. It was Khalid Sheikh Mohammed's trial. And so there was no one to follow up on that question or with an interest to follow up on that question on behalf of Abu Zubaydah. But having read Mitchell's book, I can tell you that that's a lingo, that's a language that he tends to use to describe much more serious treatment, just as the term enhanced interrogation. I guess all I was suggesting is that the government is here to tell us that, look, they've conceded that Abu Zubaydah was tortured. But because of relations with allies, with cooperating intelligence services, they won't say where it happened. And you're here saying, I need to know when it happened. And to know when it happened, the government would essentially be saying where it happened to. And that's the problem. So Mitchell and Jessen have testified before when these things happen, just not these particular things. By the way, it's important to understand that the Ninth Circuit order, the government helpfully has placed our documentary subpoena at the back of their reply brief. Most of those requests were denied by the Ninth Circuit. And among the things that were denied was a request to establish the identities of Polish nationals and contractual relationships between the United States and the Polish government in respect to the enhanced interrogation techniques. We haven't appealed that. We never appealed that. So that's not before the court. And it's important because it underscores that the Ninth Circuit did distinguish between what it perceived to be secret and what it perceived not to be secret. Can this whole thing be boiled down into much simpler terms? Is it correct that what you want in the end is a more official link between what happened and Poland? No, I wouldn't say a more official link. What you want is a link between what happened and Poland. We're looking for eyewitness testimony. To the Polish prosecutor, the site is a black box. He knows where it is. He knows when it was there. He can't look inside it. I want to shine a light inside it to understand what was happening there. That's my sole role. Well, you say you know what happened. And what you want to add is where it happened, right? That's the link. That's what this all boils down to. You want to do it indirect. You think you can do it indirectly. This will be a contributing piece of evidence that will enable you to show more confidently than you can right now where it happened. Justice Alito, I think the way I would put it, the where and the when are already known, but not the what. I would put it this way. You know, the government has argued that there's sort of a relevance issue. I would say, though, that the links to the site are already there. We're not trying to, you know, there may be information that the Polish authorities have that the government would not like them to have now. I mean, the subtlety of this is somehow escaping me. You claim you have everything, and yet you have a need for this additional information. It does seem to me all you want is a more official link from these government contractors that what you say happened, occurred in Poland and not in some other location. Otherwise, I don't see what needs you have for any of what you're asking for. Well, with your indulgence, let me offer a hypothetical, because maybe that would help focus this a little bit. Imagine there's a murder on the Orient Express, all right? The train passes through many countries on the way to its ultimate destination. The prosecutor in Budapest has determined already that the murder happened on the train in Hungary. Maybe the passenger got on the train in Hungary in the first place, and he was dead before it reached the border. So he's established that. There's an American on the train who is an eyewitness, okay? The prosecutor just needs to ask him, what did you see? And that's clearly relevant. It's clearly useful. And he doesn't even need to answer, where were you? The American doesn't even have to know that he was in Hungary at the time it happened. Well, I'm not sure how that helps you. So what did he see? Like, who did he see stab this person or shoot this person, if that's what you want? You want to know who in Poland did the things that you claim happened? No, we've been prohibited by the Ninth Circuit from asking that question. The prosecutor has what he has. We're simply trying to supplement information he already has with information that is acknowledged to be not privileged. And if the American were in an American court, he could invoke his Fifth Amendment rights against self-incrimination, right? And he could do that here as well. All the testimony will be- Well, it seems to me that that's just to play out your hypothetical. That's exactly what the American government is saying. I'm not going to say anything about what I saw in Hungary because that might incriminate me. It might be associated with me. And that would be a breach of faith with our allies and friends around the world. Well, the breach of faith would be if we were identifying the individuals involved. The Polish government, Quay government, has asked for this information. The prosecutor was centrally appointed. Originally, it was a Warsaw prosecutor, and it was transferred. Okay, so it's not correct to say that the U.S. government would be admitting anything. If you look at Director Pompeo's affidavit, he cites this given case. That case and every other case cited on both sides of the attribution issue, they're all FOIA cases. They all say unless it's a current employee of the agency in question, that's not an official confirmation of anything. Is that in the end what your argument depends on, that we should treat the contractors differently from an employee? If these people were current employees, would your entire argument go up in smoke? I think the answer might be different in those circumstances, but I don't think it's the only route for us. Again, it's the confluence, it's the combination of what they would be saying and who they are. A U.S. government employee, you know, a CIA director could certainly testify himself about declassified information, all other things being equal. We're talking about information that's declassified. When you say this is relevant, is it the question of past versus present, or is it the question of contractor versus employee? Well, I think they're both factors. In this case, they're at two removes. They can't speak for the government. They were never agents for the government. They were never employed by the government. They were never given authority to speak for the government. And if I think that it would not make a lot of sense in this context to distinguish between contractors and employees, because our foreign allies are not distinguishing in that way, they knew these two men as the architects of this program. You know, whether they were employees or whether they were contractors seems pretty irrelevant to anything, and certainly irrelevant to our foreign allies. Then what? Well, two answers to that. First of all, even if that were the Court's view in the end with respect to them, it would still be a question of whether there was a secret at all. Can they testify about non-secrets? Is context enough to change declassified information into classified information? If I turned around tomorrow and I were deposing them in an entirely different case and asked the same questions, would it somehow become non-privileged? It's already declassified. So, you know, that's point one. But point two, again, Reynolds requires that the director of the CIA or the head of whatever agency it is that is at issue, it requires that he personally review and he personally state his considered reasons for invoking the privilege. And he stated his reasons in writing here, and they were exceedingly narrow. He said the government itself cannot be heard to officially admit or deny certain facts. Officially. And that's not what he would be doing here. Thank you. Thank you, counsel. Justice Thomas? Justice Sotomayor? Justice Gorsuch? Justice Kavanaugh, anything further? Nothing further. Justice Barrett? Thank you, counsel. Rebuttal, counsel? Thank you, Mr. Chief Justice. Mr. Fletcher, I don't want to interrupt you later, so I'm just going to do it up front. Why not make the witness available? What is the government's objection to the witness testifying to his own treatment and not requiring any admission from the government of any kind? By the witness, you mean Abu Zubaydah. Right. So I was going to address this point. It goes to Justice Breyer's question about the conditions of his confinement right now. He is not being held incommunicado. He is subject to the same restrictions that apply to other similar detainees at Guantanamo. His communications are subject to security screening for classified information and other security risks, but he's able to communicate with his lawyers about security. That's not really answering my question, I don't think, because I understand there are all sorts of protocols that may or may not, in the government's view, prohibit him from testifying. But I'm asking much more directly. Will the government make the petitioner available to testify on this subject? We would allow him to communicate about this subject under the same terms as on anything else. The same terms. Look, I don't understand why he's still there after 14 years. It's a little hard to give in handy. But assuming that isn't in this case, why not do just what Justice Gorsuch says? Just say, hey, you want to ask what happened? Ask him what happened. And maybe this is special. So because the detainees at Guantanamo are all subject to a regime, a protective order in their hands. I'm not asking. I understand there are all sorts of rules and protective orders. I'm aware of that. I'm asking much more directly. And I just really appreciate a straight answer to this. Will the government make the petitioner available to testify as to his treatment during these dates? I cannot offer that now because that's a request that has not been made. And so we have not taken that back to the folks at DOD or Guantanamo. This case has been litigated for years and all the way up to the United States Supreme Court, and you haven't considered whether that's an off ramp that the government could provide that would obviate the need for any of this? Well, Justice Gorsuch, we considered the request that was put before the district court in the Ninth Circuit under Section 1782. Our position as to all communications by Abu Zubaydah is that he can communicate subject to security screening, which would include, and I just want to be clear, would include eliminating classified information. Which takes us right back to where we are, and it doesn't answer the question. And I guess will the government at least commit to answering, informing this court whether it will or will not allow the petitioner to testify as to his treatment during these dates? If the court would like a direct answer to that question, of course. I personally would appreciate a direct answer to that question. Without the government invoking a state secret privilege to the testimony. Inherent in the question is, are you going to let him testify as to what happened to him those dates? And I think we would invoke the state secret privilege always only over specific information, but I would tell you that whatever he proposes to do, we would want to apply the same sorts of screening that we're applying here to make sure that classified information is not released in the process of his testimony or in a written submission. Well, you're begging the question. I want, I think, Justice Gorsuch, and he can correct me if I'm wrong, we want a clear answer. Are you going to permit him to testify as to what happened to him those dates without invoking a state secret or other privilege? Yes or no? That's all we're looking for. Mr. Fletcher, you are here representing the government of the United States in a certain capacity. What do you understand to be the scope of your authority as you stand before us here? To represent the legal position of the United States, but in doing that, it's important to me, as it always is, to make sure that I'm representing my clients with full consultation of what's being put before them. I understand the question. To represent the interests of the United States with respect to what? With respect to all matters. Here the matters directly relevant are. With respect to all matters? I thought it would be with respect to this litigation. Correct. I'm sorry, Justice Alito, that's a better way to put it. And because this is not an issue that has been in this litigation up until now, I'm not prepared to make representations for the United States, especially on matters of national security. Justice Gorsuch, I understand your question. We'd be happy to respond. Thank you. Justice Breyer, you also asked questions. Just to wrap up a few details and then close maybe on a broader point, you asked a question about his habeas litigation. It is ongoing. He has a pending motion for release that raises exactly the question that you asked. Does the recent events in Afghanistan change the authority to detain him? I believe the government is filing a surreply on that question tomorrow. So that's an active litigation in his habeas proceeding is being handled there. Justice Kagan, you raised a question about what evidence there is about Abu Zubaydah's treatment. Please continue. When the report says that enhanced interrogation techniques stop. The testimony from the military commissions that my friend referred you to is cited in footnote 15 of the red brief. I don't have it with me, but my recollection is that what Mitchell says is that enhanced interrogation techniques were not used on Abu Zubaydah at that time, but that he was treated more shabbily than necessary. And that's all that there is on that point. Finish your rebuttal. Mr. Chief Justice, I was just going to say I wanted to close where I began and where Justice Kagan ended questioning of my friend. That I think everyone acknowledges the importance of trust in covert relationships. And so really what this case comes down to is the Ninth Circuit's holding, which my friend defended, that testimony from these two contractors would not breach that trust because they are contractors. And for the reasons that Justice Kagan identified, that they were integral to the program, that they'd be testifying under oath about information that they learned in the CIA and that is subject to confidentiality and other requirements, and that they'd be doing so in a proceeding designed to investigate and prosecute our alleged allies abroad, that would be viewed as a serious breach of trust. Thank you. Can I ask one question? Justice Kavanaugh. Mr. Fletcher, following up on Justice Breyer's question, is the United States still engaged in hostilities for purposes of the AUMF against Al Qaeda and related terrorist organizations? That is the government's position, that notwithstanding the withdrawal of troops from Afghanistan, we continue to be engaged in hostilities with Al Qaeda, and therefore the detention under law will remain proper. Thank you. Thank you, counsel. Counsel, the case is submitted.